**ATLANTIC LAND & IMPROVEMENT COMPANY, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 85–3728.

United States Court of Appeals, Eleventh Circuit.

June 3, 1986.

George K. Dunham, CSX Corp., Richmond, Va., for plaintiff-appellant.

Michael L. Paup, Chief, Appellate Section, Tax Div., U.S. Dept. of Justice, Glenn L. Archer, Jr., David Pincus, Nancy G. Morgan, Assts. Atty. Gen., Washington, D.C., for defendant-appellee.

Before HILL, Circuit Judge, HENDERSON * and BROWN **, Senior Circuit Judges.

HENDERSON, Senior Circuit Judge:

This appeal focuses on the sole issue of whether a longshoreman in the peculiar circumstances of this case is a railroad employee. The plaintiff-appellant, Atlantic Land & Improvement Company (AL & I), is a wholly owned subsidiary of Seaboard Coast Line Railroad (SCL). Its primary function is to acquire and develop real estate for SCL.

AL & I owned and operated the Rockport facility (Rockport) in Tampa, Florida, which it leased to SCL. Rockport is a phosphate loading facility at which the mineral is transferred from SCL boxcars or SCL storage tanks onto ships. To reduce particulate air pollution during loading, a tarpaulin is attached from the spout of the loading elevator to the hatches of each vessel. For each transfer AL & I hired five longshoremen who boarded the ship, attached and detached the tarps, and generally helped to implement the loading plan promulgated by the ship's captain. SCL included the cost of loading the phosphate and hiring the longshoremen in the line-haul tariff it charged its customers. The longshoremen were recruited through the local union hiring hall. All were members of the International Longshoremen's Association (ILA) and their sole duties involved loading phosphate on board the ships. Significant-

---

* See Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable John R. Brown, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

ly, AL & I paid Federal Insurance Contribution Act (FICA), 26 U.S.C. §§ 3101–26, and Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301–11, taxes for each longshoreman.

On February 16, 1977 the Internal Revenue Service (IRS) proposed the assessment of a tax against AL & I pursuant to the provisions of the Railroad Retirement Tax Act (RRTA), 26 U.S.C. §§ 3201–33, for the years 1972–1974. On May 5, 1978 the IRS issued another report reaching the same conclusion for the years 1975–1977. After unsuccessfully exhausting all administrative remedies, AL & I paid the tax on September 13, 1978. The disputed taxes were assessed by the IRS on July 23, 1979. AL & I afterwards sought a refund from the IRS but was unsuccessful in its effort. It then filed this suit in the United States District Court for the Middle District of Florida seeking a refund. AL & I contended that (1) it was not subject to RRTA taxes for the services of the longshoremen, and (2) the assessments were untimely and therefore barred by the applicable three-year statute of limitations. *See* 26 U.S.C. § 6501(a). The district court found against AL & I on both issues[1] and this appeal followed.

Whether AL & I is obligated to pay RRTA tax on behalf of the longshoremen calls for a two-step analysis. First, does AL & I meet the statutory definition of an "employer" under the RRTA, 26 U.S.C. § 3231(a)? Second, were the longshoremen employees of AL & I or independent contractors?

As a threshold matter, this inquiry is a mixed question of fact and law and therefore subject to plenary review in this court. *See Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). On the other hand, the district court's determination that the longshoremen are AL & I employees and not independent contractors is a question of fact that may be reversed only if clearly erroneous. *See Anderson v. Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ 26 U.S.C. § 3231(a) defines an "employer" for RRTA purposes as a railroad or a subsidiary of a railroad that "operates any equipment or facility or performs any service (except ... casual service) in connection with the transportation of ... property by railroad, or the receipt, delivery, elevation, transfer in transit, ... storage, or handling of property transported by railroad."[2] Thus, AL & I is an "employer" under the RRTA—and therefore subject to RRTA liability—only if it meets a two-part test: (1) is AL & I a railroad carrier or the subsidiary of a railroad carrier and (2) does AL & I perform a regular, noncasual service for SCL that is connected with the transportation of property by railroad. Since it is clear beyond peradventure that AL & I is the wholly owned subsidiary of SCL, a railroad carrier, we need consider only the second prong of the statutory definition to resolve this issue. We agree with the district court that an evaluation of the relevant facts and case law makes clear that AL & I is an "employer" under the terms of the RRTA.

"Employer" is defined in virtually identical language in the RRTA, the Railroad Retirement Act (RRA), 45 U.S.C. § 231(a)(1),[3] and the Railroad Unemploy-

---

1. For a detailed account of the factual background and procedural history of the case, see the opinion of the district court. Record Excerpts at 42–78.

2. In relevant part, 26 U.S.C. § 3231(a) provides:
   (a) **Employer.**—For purposes of this chapter, the term "employer" means any carrier (as defined in subsection (g)), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or per-

forms any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad....

3. For purposes pertinent here, 45 U.S.C. § 231(a)(1) (formerly 45 U.S.C. § 228a(a)), states:
   (a)(1) The term "employer" shall include—

ment Insurance Act (RUIA), 45 U.S.C. § 351(a).[4] The three statutes are interrelated parts of an overall plan designed to benefit railroad employees. *See Universal Carloading & Distributing Co. v. Pedrick,* 184 F.2d 64, 65–66 (2d Cir.), *cert. denied,* 340 U.S. 905, 71 S.Ct. 280, 95 L.Ed. 654 (1950). The caselaw defining and applying each therefore is highly persuasive and furnishes guidance in this case.[5]

■ *Railroad Retirement Board v. Duquesne Warehouse Co.,* 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946) involved whether a railroad-controlled warehouse company qualified as an "employer" under the RRA and RUIA. The Duquesne Warehouse Company loaded and unloaded freight transported by a railroad. Although the burden to load or unload fell on the owners of the freight, the applicable tariff charged by the railroad included this service. The warehouse company argued that it could not be classified as an "employer" because it did not deal in railroad transportation services; i.e., it performed these activities either before railroad transportation commenced or after it had ended. *Id.* at 453–54, 66 S.Ct. at 241, 90 L.Ed. at 197. The Supreme Court held that the central question was "whether a carrier's affiliate is performing a service that could be performed by the carrier and charged for under the line-haul tariffs. If it is such a service, it is a transportation service within the meaning of [the RRA and the RUIA].... In other words, if a service is involved which the railroad could perform as a part of its transportation service, it is within the present Acts." *Id.* at 454, 66 S.Ct. at 242, 90 L.Ed. at 197–98. The key is not whether other nonrailroad-owned companies provide the same service, but whether the carrier could have performed the work and charged for it. We note that subsequent courts have adopted a broad reach to the definition of "employer." *See Railroad Concrete Crosstie Corp. v. Railroad Retirement Bd.,* 709 F.2d 1404, 1408 (11th Cir.1983) (subsidiary made concrete crossties for railroad); *Southern Development Co. v. Railroad Retirement Bd.,* 243 F.2d 351, 354–55 (8th Cir.1957) (subsidiary leased buildings to railroad); *Despatch Shops, Inc. v. Railroad Retirement Bd.,* 153 F.2d 644, 645–46 (D.C.Cir.1946) (subsidiary made and rebuilt railroad cars for railroad); *Despatch Shops, Inc. v. Railroad Retirement Bd.,* 154 F.2d 417, 419 (2d Cir. 1946) (same).

AL & I fits within the guidelines set forth in *Duquesne.* It performed a service that could have been fulfilled by SCL and was included in the line-haul tariffs. As such, SCL was performing a "service ... in connection with the transportation of passengers or property by railroad," as provided in 26 U.S.C. § 3231(a).

Additionally, the activities relevant here do not fit within the "casual service" exception in 26 U.S.C. § 3231(a). The assistance rendered by SCL was neither "so irregular

---

(i) any express company, sleeping car company, and carrier by railroad, subject to part I of the Interstate Commerce Act [49 U.S.C.A. § 1 et seq.];

(ii) any company which is directly or indirectly owned or controlled by, or under common control with, one or more employers as defined in paragraph (i) of this subdivision, and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad.

**4.** 45 U.S.C. § 351(a) provides in part:

(a) The term "employer" means any carrier (as defined in subsection (b) of this section), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (except casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transport by railroad,....

**5.** The *Universal Carloading* court held that, given this interrelatedness and nearly verbatim language, these definitions should be construed and applied identically. *Universal Carloading,* 184 F.2d at 66.

or infrequent as to afford no substantial basis for an inference that such service or operation will be repeated," nor "insubstantial." *See* 20 C.F.R. § 202.6. The service was regular, frequent and substantial, as well as necessary to comply with state anti-pollution statutes. In short, it was not "casual service."

■ Having determined that AL & I meets both prongs of the definition of "employer" as set forth in the RRTA, we turn next to its contention that the longshoremen were independent contractors and not AL & I employees. Using a frequently cited Treasury regulation,[6] the district court found, as a matter of fact, that the longshoremen were employees of AL & I. The court laid out an extensive factual pattern which demonstrated that AL & I retained the right to control the longshoremen. The *right* to control, not actual control, is the most significant indicia of the true nature of the relationship. *See United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469–70, 91 L.Ed. 1757, 1769 (1947). We agree with the district court that it is noteworthy that the contractual agreement between the Tampa Maritime Association (of which AL & I was a member) and the International Longshoremen's Association (the longshoremen's union) exclusively vested the management of the employer's business and the direction of the work force in the employer. It also is important to note that by paying FICA and FUTA taxes on each longshoreman, AL & I tacitly acknowledged the existence of an employer-employee relationship. "If the

district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it." *Anderson v. Bessemer City,* —— U.S. ——, ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985). The district court's conclusion that the longshoremen were AL & I employees is not clearly erroneous.

■ The second issue raised in this appeal is whether the three year statute of limitations on tax assessments commenced when AL & I filed and paid FICA and FUTA taxes on the longshoremen. This question is one of law and therefore subject to de novo review. *See Pullman Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). We agree with the district court that the filing of FICA (Form 941) and FUTA (Form 940) returns by AL & I was insufficient to initiate the statute of limitations period as to assessments for unpaid RRTA liability.

The general rule is that "any tax imposed [under the Internal Revenue Code, or IRC] shall be assessed within 3 years after the return was filed." 26 U.S.C. § 6501(a). This rule, however, is subject to the exception that when a taxpayer fails to file a return, "the tax may be assessed ... at any time." *Id.* at § 6501(c)(3). Moreover, "any person made liable for any tax [under the IRC or its regulations] shall make a return or statement according to the forms and regulation prescribed by the Secretary [of the Treasury]." *Id.* at § 6011(a).

---

**6.** 26 C.F.R. § 31.3121(d)–1(c)(2) often is cited as providing the general guidelines for determining the existence of an employer-employee status. It provides:

Generally such [an employer-employee] relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or con-

trol the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor.

Prior to 1976, each employer was required by IRS regulation to file full, accurate quarterly returns on Form CT–1 reporting compensation paid to its employees that was taxable under the RRTA. *See* 26 C.F.R. §§ 31.6011(a)–2(a)(1); 31.6011(a)–7. AL & I admits it did not file a Form CT–1 for each of the quarters in issue; instead, it argues that the filing of FICA and FUTA returns was sufficient. The burden falls on AL & I first to determine those taxes for which it is liable and then file the appropriate return. Failure to do so tolls the statute of limitations and gives the IRS free rein to assess a tax liability at any time. *See Lucia v. United States,* 474 F.2d 565, 570–71 (5th Cir.1973).[7]

It is clear that statutes of limitations barring tax collections or assessments by the IRS are strictly construed in the government's favor. *Badaracco v. C.I.R.,* 464 U.S. 386, 392, 104 S.Ct. 756, 761, 78 L.Ed.2d 549, 556 (1984) (quoting *Lucia,* 474 F.2d at 570). In effect, the government must specifically establish each limitations defense and the taxpayer may qualify for each only by filing a proper return. The "passage of time will not prevent collection of the tax unless the Government has been informed by the taxpayer that there is, or might be, tax liability." *Lucia,* 474 F.2d at 570.

This issue is difficult because it affects equally important, yet conflicting, interests. On the one hand, an effective statute of limitations is necessary "for the purpose of assuring the taxpayer, who has made an honest return, that after such period his tax liability will not be reopened; otherwise the business of the country would always have before it the threat of additional taxes against the income of years long past." *Mabel Elevator Co. v. C.I.R.,* 2 B.T.A. 517, 519 (1925). On the other side of the coin, the finality interests of a good faith taxpayer must be weighed against the need to provide the IRS with uniform, complete information designed to facilitate full tax collection. *See C.I.R. v. Lane-Wells Co.,* 321 U.S. 219, 223–24, 64 S.Ct. 511, 513, 88 L.Ed. 684, 686–87 (1944).

Supreme Court precedent demonstrates that substance should prevail over form in this area: a good faith tax return filed on the wrong form may trigger the limitations period. *See Germantown Trust Co. v. C.I.R.,* 309 U.S. 304, 308, 60 S.Ct. 566, 568, 84 L.Ed. 770, 773 (1940) (fiduciary return filed for a trust commenced the running of the statute of limitations even though trust was held to be taxable as a corporation; use of an improper form did not toll the statute); *Zellerbach Paper Co. v. Helvering,* 293 U.S. 172, 55 S.Ct. 172, 79 L.Ed. 264 (1934). Other courts, and the IRS, have adopted the same view. *See Mabel Elevator Co.;* Rev.Rul. 79–39, 1972–1 C.B. 435; 26 C.F.R. § 301.6501(g)–1. At the same time, a mistaken filing made in good faith will not necessarily trigger the limitations period. *See Lane-Wells,* 321 U.S. at 223–24, 64 S.Ct. at 513, 88 L.Ed. at 686–87.

Of crucial importance is whether the return, as filed, included sufficient information to allow the IRS to compute the taxpayer's liability. *See Lane-Wells,* 321 U.S. at 222–23, 64 S.Ct. at 513, 88 L.Ed. at 686; *Germantown Trust,* 309 U.S. at 308, 60 S.Ct. at 568, 84 L.Ed. at 773; *United States v. National Tank & Export Co.,* 45 F.2d 1005, 1006 (5th Cir.1930), *cert. denied,* 283 U.S. 839, 51 S.Ct. 487, 75 L.Ed. 1450 (1931). The United States Supreme Court held in *Germantown Trust* that a taxpayer which filed its return on an improper form nevertheless triggered the statute of limitations because the return "contained all of the data from which a tax could be computed and assessed although it did not purport to state any amount due as tax." *Germantown Trust,* 309 U.S. at 308, 60 S.Ct. at 568, 84 L.Ed. at 773.

In *Lane-Wells,* however, the Court decided that a good faith return, filed on one form, that denied liability for a second tax, which required a second form, did not start

---

**7.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

the running of the limitations period. *Lane-Wells*, 321 U.S. at 222–23, 64 S.Ct. at 513, 88 L.Ed. at 686. The Court cited two reasons to distinguish *Germantown Trust*. First, unlike the return filed in *Lane-Wells*, the trust fund's return included all the information from which the proper tax could be computed. *Id.*, 321 U.S. at 223, 64 S.Ct. at 513, 88 L.Ed. at 686. Additionally, the Court found it significant that the taxpayer in *Lane-Wells* was liable for two separate taxes (and obligated to file two returns), unlike the taxpayer in *Germantown Trust*. *Id.* [8]

The issues before us, therefore, are (1) whether the employment tax imposed by the RRTA and the employment tax imposed by FICA "are separate and distinct taxes or whether they are so closely connected that the filing of a return with respect to one of these taxes must be accepted as the filing of a return with respect to both taxes," Rev.Rul. 82–185, 1982–2 C.B. 395, and (2) whether the return included sufficient information to compute and assess the relevant tax. *See United States v. National Tank & Export Co.*, 45 F.2d 1005, 1006 (5th Cir.1930), *cert. denied*, 283 U.S. 839, 51 S.Ct. 487, 75 L.Ed. 1450 (1931).

Unlike *Lane-Wells*—in which the taxpayer was liable for two unrelated and distinct taxes—in this case both taxes derive from a unitary tax purpose. Both are employment taxes, levied on employers, designed to provide retirement compensation. From an examination of the two statutes, it is obvious that they are interrelated and similar. They both are assessed under the same subtitle of the IRC (a fact the IRS has found significant, see Rev.Rul. 82–185, 1982–2 C.B. 395), a subtitle that Congress considered homogeneous. *See* 1954 U.S. Code Cong. & Ad.News 4025, 4468, 5126. Furthermore, RRTA relies on FICA for definitions and relevant wage standards, *see e.g.*, 26 U.S.C. §§ 3221(a); 3121(a)(1), and the IRS implicitly has acknowledged that the two are closely aligned and possible to confuse. *See* 26 C.F.R. § 31.6205–1(b)(2)(iii).

Once an employer determines for which tax it is liable it need only file a return for that particular tax; i.e., an employer liable under RRTA need not file a FICA return, and vice versa. If the RRTA limitations period does not begin to run when an employer files a mistaken, good faith determination of FICA, not RRTA, liability, an employer seeking finality must either (1) file a RRTA return that denies RRTA coverage, or (2) include sufficient extraneous data in its FICA return that is adequate to calculate its RRTA liability should it be determined, at a later date, there is liability.[9]

---

**8.** The IRS has extrapolated from *Lane-Wells* a general agency rule that "the filing of a return for one type of tax will not start the running of the period of limitations for a separate and distinct type of tax." Rev.Rul. 82–185, 1982–2 C.B. 395. *See* Rev.Rul. 79–39, 1979–1 C.B. 435; Rev.Rul. 75–552, 1975–2 C.B. 476. In such cases, the IRS has examined under which subtitle of the Internal Revenue Code (IRC) each tax falls, *see; e.g.*, Rev.Rul. 82–185, 1982–2 C.B. 395, and whether the legislative history of the applicable code sections stressed a "close connection" between the sections. *Id.*

The IRS has taken the position, on at least one occasion, that filing an employment tax return on an improper form nonetheless may initiate the limitations period for another employment tax. *See* IRS Letter Rul. 8045003. The Service held that an employer who filed in the good faith yet mistaken belief that it was an agricultural employer triggered the limitations period for its actual liability under FICA. *Id.* Such private letter rulings, of course, have no precen-

dential value. 26 C.F.R. § 6110(j)(3). The facts underlying the letter ruling, however, indicate that whether an employer is an agricultural employer, a railroad employer or a FICA employer is a close question easily confused by an employer.

**9.** The IRS implicitly acknowledges this "catch-22" situation. It has created a mechanism by which an employer who mistakenly files a timely FICA return rather than a RRTA return (or vice versa) may avoid interest liability. *See* 26 C.F.R. § 31.6205–1(b)(2)(iii). The regulation provides that an employer in such a posture need not pay interest on any underpayment if it reports "the additional amount due on an original return for the correct tax ..., accompanied by an explanation of the adjustment being reported." *Id.* Obviously, this regulation creates an incentive for each employer to ferret out erroneous returns and bring them to the attention of the IRS. Just as obviously, it demonstrates the Service's awareness that the two tax-

The complementary nature of the two taxes—RRTA and FICA—demonstrates that the two are sufficiently related to trigger the commencement of the statute of limitations, but only if the information in the return is adequate to allow the IRS to compute the tax.

The government maintains that the FICA return filed by AL & I did not trigger the three-year statute of limitations on assessments because the returns did not contain the necessary information from which the IRS could compute AL & I's RRTA tax liability. We agree. RRTA taxes are predicated on a *monthly* maximum wage base, *see* 26 U.S.C. § 3321(a), while FICA taxes are computed from an *annual* maximum wage base. *See* 26 U.S.C. § 3121(a)(1).[10] In addition, the FICA return does not include the total man-hours for which AL & I paid compensation, which information is necessary to ascertain the supplemental tax imposed by 26 U.S.C. § 3221(c). This information could be gleaned only by analyzing AL & I's raw payroll records. A return that is incomplete or which does not include sufficient data on which an assessment for the taxable period could be made does not initiate the limitations period because it is not a return.[11] *See Lane-Wells,* 321 U.S. at 222–24, 64 S.Ct. at 513, 88 L.Ed. at 686; *United States v. National Tank & Export Co.,* 45 F.2d 1005, 1006 (5th Cir. 1930), *cert. denied,* 283 U.S. 839, 51 S.Ct. 487, 75 L.Ed. 1450 (1931).

In summary, AL & I was an "employer" as defined in the Railroad Retirement Tax Act and thus subject to RRTA liability for the longshoremen. Also, the longshoremen were employees of AL & I and not independent contractors. Last, the Federal Insurance Contribution Act returns filed by AL & I, while sufficiently similar to RRTA returns not to constitute separate and distinct taxes, did not include adequate information from which the IRS could compute RRTA tax liability. Consequently, the FICA returns were not returns for RRTA purposes and the assessment by the IRS therefore was not barred by the statute of limitations.

AFFIRMED.

---

es are sufficiently intertwined that an employer may confuse them and erroneously decide it is not liable for one or the other.

**10.** For example, in 1974 FICA employers paid FICA tax on the first $13,200.00 paid to each employee during the year and RRTA employers paid RRTA tax on the first $1,100.00 paid to each employee each month. Thus, if an employee worked only one month in 1974 and received $4,000.00 compensation, a FICA employer would compute its tax for that employee by multiplying the FICA rate by the full $4,000.00. A RRTA employer, however, would calculate its tax only on the base monthly maximum—$1,100.00—and the excess would not be subject to the RRTA tax.

**11.** Ironically, had AL & I filed a RRTA return when it actually was a FICA employer, that return apparently would have included sufficient information to compute FICA liability and thus would have set the three-year statute of limitations in motion. Such a situation would be analogous to the facts underlying Private Letter Rul. 8045003 (Feb. 28, 1980), *supra* n. 7.